[Cite as *In re M.C.*, 2013-Ohio-4679.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: M.C.

C.A. Nos.    26927
                26936

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN 11-01-68

DECISION AND JOURNAL ENTRY

Dated: October 23, 2013

---

BELFANCE, Presiding Judge.

{¶1} Appellants, Dominique W. ("Mother") and Javan C. ("Father), appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed their minor child in the permanent custody of Summit County Children Services Board ("CSB"). For the reasons that follow, this Court affirms.

I.

{¶2} Mother and Father are the natural parents of M.C., born July 7, 2008. M.C. has been diagnosed with cerebral palsy and dysphagia, a swallowing condition that can cause her to vomit and/or aspirate food into her lungs. She requires ongoing medical attention from a variety of medical doctors and therapists and also requires special care in the home to meet her daily needs. This case began because Mother had not been taking M.C. to necessary medical and therapy appointments on a consistent basis, was not properly caring for her in the home, and M.C. was seriously underweight.

{¶3} On January 27, 2011, CSB filed a complaint, alleging that M.C. was a neglected and dependent child. Although CSB initially sought and obtained protective supervision while M.C. remained in the home, M.C. was removed from the home three months later because Mother was not working on the goals of the voluntary case plan. Mother's older child, who does not have special medical needs, was also removed from the home but was later returned to Mother's custody and is not a party to this appeal.

{¶4} In addition to the medical treatment and therapy for her cerebral palsy, M.C.'s dysphagia requires that her caretaker feed her primarily through a gastrostomy tube. M.C. also takes some food orally, so her caretaker must be careful to feed her only thickened foods and to do so while she is propped up in a sitting position, to help avoid regurgitation of her food. Moreover, M.C. is a "silent aspirator," which means that she lacks the typical violent cough reflex that most people have to prevent them from aspirating food into their lungs. Consequently, M.C.'s caretakers must know how to recognize her subtle queues that she might be aspirating, such as turning her head, arching her eyebrows, or frowning, and know when to stop feeding M.C. and when to seek the assistance of medical professionals.

{¶5} CSB believed that untreated mental illness was contributing to Mother's inability to get M.C. to her necessary appointments, so mental health treatment was a primary component of the case plan. Mental health professionals later confirmed that Mother's untreated depression caused her to become "overwhelmed" and/or unmotivated and interfered with her ability to manage all that she had to do to meet M.C.'s special needs. Mother began taking a prescribed antidepressant medication and started counseling to work on developing time-management and problem-solving skills. Although Mother made some progress in counseling, she attended less than half of her scheduled appointments. Her counseling case was eventually closed due to her

high rate of absences. Mother later conceded that she had also stopped taking medication or seeing a psychiatrist because she did not believe that the medication helped her.

{¶6} Father has had minimal involvement with M.C. He had no relationship with M.C. prior to her removal from the home because he was serving a four-year prison sentence for an aggravated robbery conviction at the time she was born. He remained in prison throughout most of this case and has met M.C. only two times, during supervised visits shortly before the permanent custody hearing. Although he completed anger management classes in prison, he had not addressed his history of substance abuse.

{¶7} CSB eventually moved for permanent custody of M.C. Following a hearing on that motion and the alternative motions for legal custody to Mother or Father, the trial court found that M.C. had been in the temporary custody of CSB for more than 12 of the prior 22 months and that permanent custody was in her best interest. Mother and Father separately appealed, and their appeals were later consolidated. They each assign one error, which will be addressed together because they are similar.

II.

### FATHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT'S DECISION TO GRANT THE STATE'S MOTION FOR PERMANENT CUSTODY IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### MOTHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT'S DENIAL OF MOTHER'S MOTION FOR LEGAL CUSTODY OF M.C. WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS REVERSIBLE ERROR.

{¶8} Father and Mother argue that the trial court's permanent custody decision was not supported by the evidence presented at the hearing. Before a juvenile court may terminate

parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶9}   The trial court found that the first prong of the permanent custody test had been satisfied because M.C. had been in the temporary custody of CSB for more than 12 of the prior 22 months. *See* R.C. 2151.414(B)(1)(d). Neither parent contests that finding. Instead, they challenge the trial court's best interest finding. Mother asserts that the trial court should have returned M.C. to her custody. In his assignment of error, Father challenges the evidence supporting the trial court's decision, yet he also argues on appeal that he had insufficient time to work a case plan because he was released from prison only two weeks before the permanent custody hearing. He did not raise such an argument in the trial court, however. At the hearing, his counsel explicitly recognized that the trial court was without authority to extend temporary custody because the two-year sunset date had already passed. *See* R.C. 2151.353(F); R.C. 2151.415(D)(4). Consequently, Father's trial counsel did not request an extension of temporary custody or make any other argument that he should be accorded more time to work toward reunification under the circumstances. Instead, he requested that the court consider Father as a custodian for M.C. Consequently, this Court limits its review to whether the trial court's conclusion that it was in the best interest of M.C. to be placed in the permanent custody of CSB,

rather than in the custody of either of her parents, was against the manifest weight of the evidence.

{¶10} When determining whether a grant of permanent custody is in the children's best interests, the juvenile court must consider the following factors:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency * * *.

R.C. 2151.414(D)(1)(a)-(d).[1]

{¶11} Although most witnesses agreed that there was a bond between Mother and M.C., they further observed that Mother did not engage in much communication or loving interaction with M.C. The primary evidence about Mother's interaction with M.C. focused on her ability to provide for the child's special medical needs. Improving Mother's ability to meet M.C.'s special needs was the primary reunification goal of the case plan. CSB connected Mother with service providers who could help her make and keep track of M.C.'s appointments, arrange transportation to all of the appointments, and learn to provide proper care for her in the home.

---

[1] The factor set forth in R.C. 2151.414(D)(1)(e) does not apply to the facts of this case.

{¶12} One of M.C.'s treating professionals who testified was a licensed speech pathologist who performed some of M.C's swallow tests and was in charge of M.C.'s out-patient oral feeding evaluations and follow-up therapies. She testified that M.C. requires a caretaker who will "consistently pay attention to her," get her to all necessary medical appointments, and be able to put M.C.'s needs ahead of her own. She explained that Mother's participation in M.C.'s feeding therapy was inconsistent. Although Mother was encouraged to attend all of M.C.'s medical and therapy appointments during this case, the evidence demonstrated that she attended only about half of them, came late to several, and did not actively participate when she did attend.

{¶13} By the time of the permanent custody hearing, M.C. was attending regular appointments with her primary care doctor as well as multiple medical specialists, nutritionists, and therapists. M.C. required a caretaker who could get her to all of her appointments on a consistent basis and also be able to administer regular physical therapy at home, correctly brace her legs as needed, feed her correctly by mouth and through the g-tube, and provide any additional special care that she may need. It was not disputed that the home procedures were not difficult to learn, but it was essential that they be done correctly and consistently or M.C. could suffer adverse health consequences. Several witnesses testified that Mother's ability to care for M.C. did not show significant improvement and that they had to continually correct Mother because she was feeding and bracing M.C. incorrectly.

{¶14} As noted above, M.C. received nutrition both through the g-tube and orally through manual feeding. The speech pathologist continually reminded Mother that M.C. must sit up straight when engaging in manual feeding to allow M.C. to swallow correctly. She encouraged Mother to get a special chair or feed M.C. in a highchair with rolled towels

supporting her, but Mother continued to feed M.C. incorrectly, apparently not appreciating the important safety concerns in proper positioning of M.C. while she ate. Several witnesses continued to observe Mother feeding M.C. while she was lying down or slumped in an umbrella stroller. Mother also failed to show improvement in her ability to keep track of M.C.'s appointments. Rather than scheduling the appointments herself and noting them in a notebook or calendar, she chose instead to rely on the foster mother to make the appointments and remind her to attend each one. Mother testified that she had missed some of the medical appointments because the foster mother did not remind her until an hour or two before the appointment.

{¶15} Mother also attributed some of her absences to the fact that she needed to get to Akron Children's Hospital from her home in Twinsburg, but she did not have a vehicle and there was infrequent bus service between Twinsburg and Akron. She also missed appointments because they did not always coincide with her older child's school schedule. Although the caseworker attempted to connect Mother with church groups and other providers who could assist her with transportation and/or provide child care, Mother did not take advantage of those opportunities. At the hearing, she testified that she would try to move back to Akron if M.C. were returned to her home, which would make her "whole life better, transportation and everything."

{¶16} M.C. often had more than one appointment on the same day, to be more convenient for Mother, M.C., and the foster Mother, but Mother still did not attend regularly. In fact, she would sometimes attend one appointment on a given day but not attend the other appointment or appointments that were scheduled almost immediately afterward. According to her former counselor, Mother became overwhelmed when M.C. had several appointments on the same day.

{¶17} Because Mother missed so many of the medical and therapy appointments, she did not stay abreast of M.C.'s changing needs, nor did she develop the skills required to care for M.C. in her home. Moreover, Mother's inability to regularly attend the appointments by herself strongly suggested that she lacked the ability to handle the additional challenge of transporting her disabled child to and from all of the appointments.

{¶18} Father's relationship with M.C. and ability to care for her was even less developed. Because he had been incarcerated throughout most of M.C.'s life, his interaction with her had been confined to two supervised visits shortly before the permanent custody hearing. He had not attended any of her medical or therapy appointments or otherwise learned how to care for any of her special needs. Because his interaction with M.C. had been so limited, he had not developed any bond with her, nor did he know how to provide for her basic or special medical needs.

{¶19} The guardian ad litem spoke on behalf of M.C., offering her opinion that permanent custody was in her best interest. Based on the guardian's interaction with Mother and her observations of Mother attempting to provide care for M.C., she did not believe that Mother had the ability to adequately address M.C.'s special medical needs. Because Father had been out of prison for such a short time, the guardian had not had the opportunity to observe him with M.C.

{¶20} At the time of the hearing, M.C. had been living outside Mother's home in temporary placements for nearly two years. During that same period, despite help from numerous service providers, Mother had made little progress improving her ability to meet M.C.'s special needs. Neither parent was prepared to provide for M.C.'s long-term needs at the time of the permanent custody hearing and CSB had been unable to find any suitable relative

who was able to do so. Consequently, the court reasonably concluded that M.C. was in need of a legally secure permanent placement, which could only be achieved by placing her in the permanent custody of CSB.

{¶21} There was ample evidence before the trial court to support its conclusion that permanent custody was in the best interest of M.C., and, thus, we cannot conclude that its decision was against the manifest weight of the evidence. Mother's and Father's assignments of error are overruled.

### III.

{¶22} The parents' assignments of error are overruled. The judgment of the Summit County Court of Common pleas, Juvenile Division, is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
EVE V. BELFANCE
FOR THE COURT


HENSAL, J.
CONCURS.

CARR, J.
DISSENTING.

{¶23} I respectfully dissent. Although Father may not have properly raised an argument that he should have been granted more time to work on a case plan, I would find merit in his challenge to the weight of the evidence supporting the trial court's decision. Specifically, the trial court found that "[n]either parent has made significant progress on their case plan objectives to allow them to assume custody of [M.C.]" This finding was not supported by the record insofar as it pertained to Father. The original case plan included no goals for Father and he was removed from the case plan the first time it was amended. CSB's reason for removing him was merely that "[Father] is in prison" and that it "can not provide services to [him], at this time."

{¶24} Father would have been unable to participate in certain reunification services such as visiting M.C. or attending her medical and therapy appointments, and his incarceration may have affected the reasonableness of efforts to be exerted by CSB, but it is unclear why his incarceration in an Ohio prison justified excluding him from the case plan altogether. He had not been convicted of any crime that would justify a lack of reasonable case planning efforts under R.C. 2151.419(A)(2). Although I recognize that M.C. requires a caregiver who is able to provide

for her special medical needs on a consistent basis, Father also has a fundamental right to raise

his child, which appears to have been overlooked in this case.

APPEARANCES:

LEONARD J. BRIEDING, Attorney at Law, for Appellant.

GREGORY PRICE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

JOSEPH KERNAN, Attorney at Law, for Guardian ad litem.